IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA,

JOHN ALFARO,

    Petitioner,          No. CIV-S-03-0093 DFL KJM P

    vs.

D. RUNNELS,                  <u>ORDER AND</u>

    Respondent.         <u>FINDINGS AND RECOMMENDATIONS</u>

_____ /

        Petitioner is a state prisoner proceeding with counsel[1] with an application for writ of habeas corpus under 28 U.S.C. § 2254. Petitioner was convicted in the Superior Court of San Joaquin County of first degree murder and is currently serving a sentence of twenty-five-years-to-life imprisonment in the California Department of Corrections. Petitioner challenges his conviction on grounds of jury instructional error and ineffective assistance of counsel.

I. <u>Background</u>

        Petitioner was convicted following a trial by jury. After sentencing, petitioner appealed his conviction and sentence to the California Court of Appeal. The Court of Appeal summarized the facts presented at trial as follows:

---

[1] Petitioner's counsel substituted in after the answer was filed.

1

In 1997 [Christian] Knoles, having discovered he was homosexual, divorced his wife and, a few months later, moved in with defendant. Knoles, according to many who testified at his trial, was friendly, outgoing, ambitious, and studious. He was quite a talker and freely dispensed advice. A butcher by trade, he was pursuing an education with hopes of transferring to a university. He appeared to have applied the same intensity to his physical conditioning and, over time, became disgusted with what he perceived as defendant's lethargy, slovenliness, and lack of ambition.

Nevertheless, defendant, a civilian employee at the San Joaquin County Jail, was in love with Knoles. Defendant made the down payment on and invested $40,000 in refurbishing a house he and Knoles shared. They took title as joint tenants. Defendant tried to limit Knoles's socializing with other men. The relationship steadily deteriorated, and although they continued to live together, they ceased having sexual relations.

In 1999 Knoles met S.R. on line in a chat room, "Modesto Men for Men." They became good friends. When they were not physically together, they spent hours connected electronically, communicating by cellular telephone, e-mails, or through their instant messenger services. Knoles told a friend that although S.R. was not gay, he "could be had." They decided to live together.

On October 22, 1999, Knoles submitted a rental application with a deposit for an apartment. Although at trial defendant testified he was relieved Knoles, who had become verbally abusive, was moving out, he wrote him a letter professing his hurt over their breakup and pleading with him not to have other men over to the house. On one occasion when S.R. was at the house, Knoles became agitated upon discovering defendant peeking in the windows.

On October 25, 1999, Knoles met S.R. and reported that while he was looking for something in a closet in the house, he saw some movement, and defendant jumped out at him. Knoles, upset by defendant's "weird" behavior, did not want to remain at home. He and S.R. spent the late afternoon and evening together.

S.R. testified that when he and Knoles left each other that evening, they continued to talk on their cellular phones, as was their custom, until they arrived home. Once home, S.R. immediately sent Knoles two e-mail messages, one of which was opened and the other deleted unopened.

Just before midnight, defendant called 911. As recounted in defendant's opening brief, he told the dispatcher, "'I just found my roommate in the spa and he is not breathing.'" He was hysterical. The call was transferred to the fire department dispatcher. On the

audio tape of that conversation, defendant is heard saying, "'Oh my god, he's not breathing . . . Oh my god. Try to get him out of the water . . . I was inside, then I heard the . . . the . . . the pump in the spa to the pool on and it's kind of unusual for it to be on this late.'"

It took several firefighters to pull Knoles from the spa, where he was seated upright with the water line to the middle of his chest. He had no pulse and he was not breathing. They attempted unsuccessfully to resuscitate him. Law enforcement officers, who arrived shortly thereafter, observed multiple injuries to the body.

The forensic pathologist grouped the injuries into 22 categories, concluding that 11 groupings were inflicted at or near the time of the death, nine existed for hours or days prior to death and two were sustained postmortem. Among the acute injuries were multiple injuries to the top and back of the head, an abrasion on the forehead, and bruises on the face and wrists. The pathologist's list of abnormal findings included: (1) asphyxia due to fresh water drowning, indicated by froth and foam in the lungs; (2) blunt impact to the head; (3) asphyxia due to compression of the neck, indicated by hemorrhage on the right side of the neck; (4) ligature marks on the wrists; and (5) pulmonary congestion from drowning. She concluded the cause of death was "due to asphyxia, due to fresh water drowning, due to blunt impact to the head and compression of the neck with unconsciousness while in water."

In a search of defendant's house, the police seized a number of bondage items, including two black "metal-like" leashes with white metal chains and white metal clasps, two black leather wrist straps with white metal buckles and spikes, a leather "harness" with white metal chains and snaps, a belt with metal hoops, a white metal ring with two leather-like bands with white metal clasps attached, a whip, bikini-type underwear with zippers, two black wrist bands with white metal spikes, and two black collars with metal buckles and spikes. Defendant claimed he and Knoles were not into bondage and he was surprised to find the bag of leather bondage items in Knoles's closet.

Defendant gave a number of inconsistent accounts of what happened on the night Knoles died. He initially told police he awoke around 11:00 p.m., saw a pool light on, and found Knoles lying face down in the spa. He could not lift the heavy lifeless body out of the spa. Defendant stated his sexual relationship had broken off two years earlier.

At police headquarters, defendant insisted Knoles was not going to move out even though earlier he had written a letter to Knoles acknowledging the pending move. In the same letter defendant expressed how hurt he had been when he saw Knoles with another man at their house. In a lengthy interview, he insisted he was not angry or upset with Knoles.

3

> Defendant told Knoles's ex-wife, however, that on the night of the drowning, he tried to talk to Knoles about their breakup. Defendant admitted that after Knoles made several derogatory remarks, defendant became angry and pushed Knoles, who fell backward into the spa. Knoles started "flopping around like a fish." Defendant insisted he did not intend for Knoles to die when he pushed him.
>
> At trial, defendant claimed the death was an accident. He stated that although Knoles called him a "pussy," a "fucking asshole," and a "simpleton," he was not angry. He testified that he was looking forward to Knoles's moving out because Knoles had become increasingly verbally abusive. Nevertheless, he stated he did not take the criticism personally because he understood Knoles was stressed. He insisted he was not angry. He explained to the jury he pushed the victim as he was "kind of walking by him," but he did not see the victim fall into the spa until a "couple of seconds later. I just happened to glance to my right." Unable to lift the victim from the spa, defendant explained he called 911.

Answer, Ex. B at 1-6.

The Court of Appeal affirmed petitioner's conviction for first degree murder. <u>Id</u>. at 14. Petitioner sought review of the Court of Appeal's opinion in the California Supreme Court.[2] The petition for review was denied without comment. <u>Id</u>., Ex. C.

Following direct review, petitioner sought collateral relief at all three levels of California courts. All three requests for collateral relief were denied. <u>Id</u>., Exs. D-F.

II. <u>Standards For Granting Habeas Relief</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Federal habeas corpus relief also is not available for any

/////
/////
/////
/////

---

[2] On February 7, 2006, respondent filed a copy of the Petition for Review petitioner filed in the California Supreme Court. <u>See</u> Docket Entry #16.

4

claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA). See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[3]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

/////

/////

---

[3] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta." However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees. Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief. See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

/////

III. Arguments And Analysis

    A. Jury Instructional Error (Claims 1-4)

Petitioner claims his right to a fair trial, arising under the Due Process Clause of the Fourteenth Amendment, was compromised by erroneous jury instructions. Federal habeas courts do not grant relief, as might a state appellate court, simply because a jury instruction may have been deficient. The only question for the federal court is whether the allegedly ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1974). A violation of due process occurs if a trial is fundamentally unfair. Estelle v. McGuire, 502 U.S. 62, 72-73 (1991).

        1. Motive

Petitioner's first claim is that the trial court erred by refusing a defense instruction that would have informed jurors that evidence of motive alone is not sufficient to support a conviction for murder. Mem. P. & A. in Supp. Pet. (Pet.) at 25-28. In his traverse, petitioner clarifies that this claim is essentially that his conviction cannot stand under Jackson v. Virginia, 443 U.S. 307 (1979),[4] because, according to petitioner, the only evidence presented at trial suggested petitioner had a motive to kill Mr. Knoles and that petitioner caused Knoles' death accidentally. Traverse at 2.

    The California Court of Appeal rejected this claim noting:

> Defendant admitted pushing Knoles into the spa. His own acts therefore, coupled with the extensive number of acute injuries to the victim's head, face, back, and wrists were evidence beyond mere motive.

Answer, Ex. B. at 7.

    The Court of Appeal's determination that there was substantial evidence beyond

---

[4] Under Jackson v. Virginia, 443 U.S. 307, 319 (1979), a criminal conviction will stand if, after viewing the evidence in the light most favorable to the prosecution, the court finds that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

7

that tending to show petitioner's motive for killing Christian Knoles is fully supported by the record.  For example, petitioner admitted Christian Knoles died after petitioner and he were involved in an argument, and after petitioner pushed Mr. Knoles. RT 1148:3-1151:16.  Also, Knoles sustained numerous injuries that were not consistent with a simple fall into a spa. See RT 473 et seq. (testimony of forensic pathologist Sally Aiken).  Furthermore, the jury was instructed regarding the elements of first degree murder, RT 1526:8-1528:24; CT 294-297, none of which required that petitioner have motive to kill Mr. Knoles.  The jury also was told that motive was not an element of any charged crime and need not be shown. RT 1521:3-10; CT 278.

Petitioner's first claim does not satisfy 28 U.S.C. § 2254(d) and verges on the frivolous.

### 2. Unanimity

In his second claim of instructional error, petitioner claims his right to due process was violated because the trial court failed to instruct jurors that they had to all agree on the theory that explained petitioner's death, after having heard multiple alternative theories from the prosecution. Pet. at 29-35.  On direct appeal, petitioner's claim was denied on state law grounds by the California Court of Appeal; the Court of Appeal did not expressly discuss whether petitioner's federal rights were denied by failure to give a "unanimity" instruction.  Answer, Ex. B at 7-10.  Petitioner's claim was denied by the California Supreme Court without comment. Id., Ex. C.

The state court's rejection of petitioner's claim does not reflect an objectively unreasonable application of the appropriate federal principles.  As petitioner notes in his habeas application, the Supreme Court has never found that, in a case such as this where death could have resulted from a number of different factual scenarios, jurors have to agree on the precise act that caused death. Pet. at 35 (citing Schad v. Arizona, 501 U.S. 624, 630 (1991)).  In fact, in one of the cases petitioner cites in support of his claim, the Supreme Court specifically indicates that jurors need not agree on the specific facts supporting an element of a federal crime as long as the

jurors find there is evidence to support all the elements of the crime. Richardson v. United States, 526 U.S. 813, 817 (1999).[5]

### 3. Consciousness Of Guilt

At trial, jurors were instructed as follows:

> If you find that before this trial . . . [the] defendant made a willfully false or deliberately misleading statement concerning the crime[s] for which he is now being tried, you may consider that statement as a circumstance tending to prove consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide.
>
> Only when the defendant's false statement is intentional, rather than merely mistaken and where such statement suggests that the defendant has no true exculpatory explanation can it be considered as an admission of guilt.

RT 1517:14-25; CT 349.

Petitioner argues that the trial court's giving this instruction violated his right to due process because the instruction "invites conviction on evidence which is not relevant to intent or premeditation." Traverse at 4; see also Pet. at 36-40. Specifically, he urges that by allowing the jury to consider a false statement as "a circumstance tending to prove consciousness of guilt," as opposed to "consciousness of some wrongdoing," the instruction provided a basis for the jury to use petitioner's false statements to supply the premeditation element of first degree murder, in a case in which circumstantial evidence of premeditation was "extremely thin." Pet. at 39-40. Petitioner presented this claim to the California Supreme Court on direct review. Pet. for Review at 16-20. The claim was denied without comment. Answer, Ex. C.

Petitioner has not met his burden of showing that the California Supreme Court's rejection of this claim was based on an objectively unreasonable application of federal law. Petitioner fails to point to any federal case condemning the above instruction or supporting his

---

[5] Petitioner asserts the Supreme Court may revisit this conclusion in light of its decision in Apprendi v. New Jersey, 530 U.S. 466 (2000). This speculative argument does not assist petitioner in overcoming the requirements of 28 U.S.C. § 2254(d) at this time.

9

1  position that the jury should have been instructed explicitly that it could not use false statements
2  to supply the element of premeditation.  Rather, the Ninth Circuit has expressly approved the
3  instruction he challenges.  <u>Turner v. Marshall</u>, 63 F.3d 807, 819-20 (9th Cir. 1995), <u>overruled in
4  part on other grounds</u>, <u>Tolbert v. Page</u>, 182 F.3d 677 (9th Cir. 1999); <u>cf</u>. <u>United States v. Perkins</u>,
5  937 F.2d 1397, 1401-02 & n.2 (9th Cir. 1991) (finding similar consciousness of guilt instruction
6  constitutional).  Furthermore, the language of the instruction specifically indicates that a jury
7  cannot convict based upon evidence of consciousness of guilt alone.  It follows from the
8  instruction that there must be evidence satisfying each element of a crime, not including evidence
9  concerning consciousness of guilt, in order for petitioner to be found guilty of that crime.

10                    4.   <u>Intent Required For Implied Malice Second Degree Murder</u>

11             Petitioner claims his right to due process was denied because instructions that
12  defined first and second degree murder were confusing to his jury.  Pet. at 41-44.  In particular,
13  petitioner asserts that instructions explaining that first degree murder requires a finding of intent
14  to kill suggested that implied malice second degree murder also requires a finding of intent to
15  kill, effectively eliminating implied malice second degree murder as a lesser included offense for
16  the jury's consideration.  This claim was presented to the California Supreme Court on direct
17  review, Pet. for Review at 21-24, and was denied without comment.  Answer, Ex. C.

18             The California Supreme Court's rejection of this claim does not reflect an
19  objectively unreasonable application of federal law.  Jurors were instructed that, in order to find
20  petitioner guilty of first degree murder, they had to find that petitioner intended to kill Mr.
21  Knoles.  CT 376-377.  Jurors also were instructed that they could find petitioner guilty of second
22  /////
23  /////
24  /////
25  /////
26  /////

degree murder, if jurors found that the killing of Mr. Knoles:

> 1. Resulted from an intentional act;
>
> 2. The natural consequences of which are dangerous to human life; and
>
> 3. The act was deliberately performed with knowledge of the danger to and conscious disregard for, human life.

CT 379. This instruction conveys that petitioner need not have actually intended to kill petitioner to be guilty of second degree murder. Petitioner argues the following additional instruction confused matters:

> There must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator in the crime charged in Count One, murder, a violation of penal code section 187, and its lesser included offense of second degree murder. Unless the specific intent exists the crime to which it relates is not committed.

CT 366. In the context of the other instructions given, however, this instruction merely informs jurors that an act and the required intent must accompany one another; it does not suggest what sort of intent is required to convict.[6] For the required intent, the jurors are presumed to have looked at the separate instructions for first and second degree murder. See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) (court presumes jurors follow jury instructions absent extraordinary situations).

Petitioner further argues that an instruction regarding battery and battery with serious bodily injury confused matters because the instruction identified battery as a general intent crime but omitted to say second degree murder was as well. See CT 311. Petitioner's argument that the effect of this instruction, too, was to eliminate implied malice second degree murder as a lesser included offense for the jury's consideration, while impressive in its level of

---

[6] The phrase "specific intent" appearing in the above instruction was not defined for jurors. Petitioner has not pointed to any part of the record demonstrating that jurors understood "specific intent" in the specialized way a lawyer does.

11

abstraction, is an instance of protesting too much.  In context, a plain reading of the challenged instruction demonstrates it does not conflict with or void the separate instructions regarding what the jury needed to find if it wished to convict on implied malice second degree.  See CT 378-379.

Because the manner in which jurors were instructed with respect to the intent required to convict of first degree murder and implied malice second degree murder did not render petitioner's trial fundamentally unfair, petitioner's final claim of instructional error should be rejected.

### B. Ineffective Assistance Of Counsel (Claims 5, 6)

Petitioner asserts his trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment.  The Supreme Court has enunciated the standards for judging ineffective assistance of counsel claims.  See Strickland v. Washington, 466 U.S. 668 (1984). First, a defendant must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 688.  To this end, the defendant must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at 690.  The court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id.  Second, a defendant must affirmatively prove prejudice.  Id. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.; see also United States v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985); United States v. Schaflander, 743 F.2d 714, 717-18 (9th Cir. 1984) (per curiam).

#### 1. Financial Gain As Additional Motive

Petitioner asserts that trial counsel should have presented evidence rebutting prosecution evidence suggesting petitioner killed Christian Knoles for financial gain.  Pet. at 45-52.  Petitioner also claims trial counsel should have objected when the prosecution, during

closing argument, argued as much. Id. Finally petitioner claims trial counsel should have objected when hearsay evidence was presented indicating there was a gun in the house petitioner and Mr. Knoles shared at the time Knoles died. Id. These claims were presented to the California courts on collateral review. The only court to issue a reasoned decision with respect to these claims was the Superior Court of San Joaquin County:

> "In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. People v. Williams (1997) 16 C.4th 153, 214.
>
> Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [M]ere failure to object to evidence or argument seldom establishes counsel's incompetence." People v. Felix (1994) 23 C.A.4th 1385, 1394-1395.
>
> As has often been noted by the courts, trial counsel may decide not to object to evidence or an argument because an objection would highlight testimony or an argument and make it seem more significant. People v. Williams (1987) 16 C.4th 153, 214; People v. Felix (1994) 23 C.A.4th 1385, 1394-1395.
>
> <u>Trial counsel failed to object to a prosecution argument that the murder may have been motivated by a fear that the victim would take ½ interest in a house</u>
>
> The prosecution's case focused primarily upon jealousy as the motive for Petitioner's actions. It was during Petitioner's own testimony that the issue of the home, its equity and ownership was addressed. The prosecution seized upon that testimony to suggest a *secondary* motive-a financial motive.
>
> The record reflects that Petitioner cared deeply for the victim. Petitioner acknowledged that they were once intimate and that it hurt him when the two took separate bedrooms. Petitioner further

acknowledged that it hurt him to know that the victim had relations with other men in the house. During his cross-examination, Petitioner was asked whether it bothered him that the victim had not invested monies for the refurbishing of the home, but would be able to walk away with a 50% interest in the home. Petitioner answered "No."

As counsel for Petitioner asserts, the title document for the home suggests that the home was held by Petitioner and the victim as tenants in common, and so, there was no right of survivorship. Thus it would be error for the prosecution to draw the conclusion that Petitioner killed the victim to get the house and to argue it. A review of the record shows that while the prosecutor argued the existence of a financial motive, the argument was more to the effect that Petitioner had an additional reason for being upset and angry with the victim. The argument does not suggest that the Petitioner killed the victim in order to obtain title to the home.

Moreover, in light of the evidence in support of the jealousy motive, this court cannot say that a different result would have resulted but for counsel's failure to object to this one argument by the prosecutor.

<u>Trial counsel failed to object to hearsay testimony that suggested there was a gun in the house</u>

The testimony regarding the presence of a gun in the home came from testimony not meant to establish the truth of the matter asserted, but rather to establish the victim's state of mind. As such, it was admissible. The record further reflects that when the prosecution asked Petitioner if there was a gun in the home, Petitioner explained that the victim had had a gun, but had given it to his mother before moving into the Stockton home. When the prosecutor suggested that a gun was involved in the murder, an objection was made and sustained by the court. When directly asked by the prosecution if he used a gun on the victim, Petitioner replied, "We don't have a gun."

In error, the prosecution continued with his questioning relying on the "state-of-mind" testimony as if the testimony established the presence of a gun. Trial counsel could have objected, but didn't. Instead, he allowed Petitioner to explain that he didn't own a gun. That was a tactical and reasonable decision on the trial counsel's part and as such, it is afforded substantial deference.

Answer, Ex. D at 1-3. Petitioner's subsequent petitions to the state appellate and Supreme Court were denied without comment. <u>Id</u>., Exs. E, F.

Petitioner has not met his burden of showing that the state Superior Court's adjudication of petitioner's ineffective assistance of counsel claims concerning petitioner's possible motive for killing Mr. Knoles resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner does not dispute that the evidence presented and the arguments made by the prosecution focused upon jealousy as the primary motive for petitioner's killing Christian Knoles. While the prosecution presented a limited amount of evidence suggesting that the murder also may have been motivated by financial gain, RT 1115;13-28, 1229:20-28, 1302:8-1303:9, and then argued as much to a very limited degree in closing, RT 1402:15-28, petitioner has not shown that either the evidence or closing argument had any meaningful effect on the jury's verdict. Therefore, trial counsel did not prejudice petitioner's case by failing to present evidence rebutting the prosecution's evidence or by failing to object to the prosecution's closing.

The court notes that petitioner has submitted a declaration from attorney Steven Clair in which Mr. Clair indicates petitioner did not hold a right of survivorship from Mr. Knoles with respect to the home they owned in Stockton. Pet., Attach. A. Petitioner asks that the court hold an evidentiary hearing to permit examination of Mr. Clair so that petitioner can show he did not stand to gain full ownership of the Stockton house upon the death of Mr. Knoles. The court will deny petitioner's request because even if Mr. Clair testifies as indicated, his testimony would not affect the court's resolution of this case.[7] As noted above, given the relatively inconsequential nature of the evidence presented concerning petitioner's possible financial motivation for killing Mr. Knoles, and the prosecution's passing argument based on that

---

[7] A state habeas petitioner is entitled to an evidentiary hearing on a claim only "if he alleges facts that, if proven, would entitle him to relief." Turner v. Calderon, 281 F.3d 851, 890 (9th Cir. 2002)

15

evidence, trial counsel did not prejudice petitioner's case by failing to rebut the evidence or object to the closing argument.

### 2. Presence Of Gun In House

Petitioner's other ineffective assistance of counsel claim, that trial counsel should have objected when S.R. testified regarding the presence of a gun in petitioner's and Mr. Knoles' house, is equally unavailing. Pet. at 53-58. As indicated in the statement of facts appearing in the California Court of Appeal's decision concerning petitioner's direct appeal, Mr. Knoles met and spoke with S.R. shortly before he was killed and reported that, as he was looking for something in a closet at his home, he saw something moving. At trial, S.R. testified that Mr. Knoles' initial response to whatever he saw in the closet was to "r[u]n to get a gun." RT 363:6-10. Petitioner claims counsel should have objected to this statement and had it excluded from the record.

The Superior Court's determination that the statement was admissible is not unreasonable because the statement tended to show Mr. Knoles' state of mind at the time he spoke with S.R. However, the jury was never instructed that it should not consider the statement that Knoles was going to get a gun for any purpose other than determining whether Knoles was afraid, for example, that there actually was a gun in the house. Petitioner's best argument is that trial counsel's performance was deficient for not seeking such a limiting instruction. In any case, petitioner was not prejudiced by counsel's inaction. Petitioner testified that he did not have a gun. RT 1334:18-21. Whether there was a gun in the house had limited if any relevance in determining whether the state proved, beyond a reasonable doubt, that defendant killed Mr. Knoles. The precise manner in which petitioner killed Mr. Knoles is unclear. It is possible that, despite his own testimony to the contrary, petitioner used a gun to gain control of Knoles, but it also is possible that petitioner gained control in any number of other ways.

What is clear is that petitioner killed Knoles, there was evidence he had a motive to do so, nothing suggests petitioner did not have the ability to do so even if he did not use a gun,

and the manner in which petitioner changed his story regarding Knoles' death and the injuries sustained by Knoles formed an adequate basis for jurors to find that Knoles' death was not an accident. Even if trial counsel had objected to the gun evidence, or excluded it or limited its use by the jury through a clarifying instruction, such actions are not reasonably likely to have changed the result of petitioner's trial.

Petitioner's ineffective assistance claims do not provide grounds for habeas relief.

IV. Conclusion

For the foregoing reasons, the court will recommend that petitioner's application for writ of habeas corpus be denied.

In accordance with the above, IT IS HEREBY ORDERED that petitioner's July 9, 2003 request for an evidentiary hearing is denied; and

IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 27, 2006.

UNITED STATES MAGISTRATE JUDGE

1 alfa0093.157(a)